Argued and submitted March 16, reversed and remanded with instructions to remand to the PUC for reconsideration November 10, 2004

# NORTHWEST PUBLIC COMMUNICATIONS COUNCIL,
## fka The Northwest Payphone Association,
*Appellant,*

*v.*

# PUBLIC UTILITY COMMISSION OFOREGON,
*Respondent,*
*and*

# QWEST CORPORATION,
*Intervenor-Respondent.*

## 02C-12247; A119640

### 100 P3d 776

Brooks E. Harlow argued the cause for appellant. With him on the briefs were William H. Walters and Miller Nash LLP.

Jas. Jeffrey Adams, Assistant Attorney General, filed the brief for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

John P. Nusbaum argued the cause for intervenor-respondent. With him on the brief were Lawrence Reichman and Perkins Coie LLP, and Alex Duarte and Qwest Corporation.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

Wollheim, J., concurring.

## EDMONDS, P. J.

Appellant Northwest Public Communications Council is an organization of businesses that provide pay telephone service to the public. The businesses use the telephone lines and other services of regulated local exchange carriers (LECs) to carry out their activities.[1] Appellant appeals a decision of the trial court that affirmed an order of respondent Oregon Public Utilities Commission (PUC) setting the rates that respondent Qwest Corporation (Qwest), a regulated LEC, charges appellant's members for payphone services[2] in Oregon. We reverse and remand.

Appellant challenges the PUC's final order in Docket UT-125 and its order on reconsideration of the payphone aspects of that final order. In Docket UT-125 the PUC evaluated the rate schedule that Qwest filed for all of its regulated intrastate services, not just those relating to payphones. Under state law, the PUC's responsibility was to determine, after a hearing, whether Qwest had proved that its proposed rates were just and reasonable, and, if they were not, to adjust the rates so that they were. *See* ORS 759.180(1). In making that determination, the PUC followed the traditional procedure for reviewing a regulated utility's rate schedule. In the first phase of the proceeding, it established the rate of return that Qwest was entitled to receive on its property that is used or useful for providing regulated services in Oregon (Qwest's rate base). In the second phase, the PUC evaluated the rates that Qwest proposed for its various services and made appropriate adjustments so that, as a package, they would provide it the opportunity to earn that return. One consequence of following the traditional method is that reducing the rates for one service is likely to require raising the rates for another. That is necessary in order to provide Qwest an opportunity to earn the intended rate of return on its rate base as a whole. Thus, the rates for one service may

---

[1] The record and the parties' briefs contain a number of acronyms, not all of which are discussed or explained in the briefs. Although we were able to determine the meaning of each relevant acronym, it would have been helpful if the parties had provided a separate list for our reference.

[2] We will use "payphone services" to refer both to telephone lines and to other services when that usage is clear from the context of our discussion.

be greater than Qwest's costs while the rates for another may be less. When that happens, the first service is said to subsidize the second.

In its final order, the PUC adopted Qwest's proposal for the rates that a payphone service provider (PSP), such as appellant's members, will pay for the use of a payphone access line (PAL). It agreed with Qwest that those rates should be essentially the same as the rates that Qwest charges for a business phone line. As well as paying for a PAL, a PSP will also need to use Qwest's CustomNet call screening service, which permits a PSP to avoid fraudulent use of the payphone.[3] The PUC approved Qwest's proposed rate for CustomNet without examining Qwest's cost of providing the service. Although a majority of Qwest's lines that have CustomNet service are PALs, the service is available for other lines as well, and 37 percent of lines with CustomNet serve customers other than PSPs.[4]

■ Appellant does not challenge the rates for PALs and CustomNet under Oregon law. Rather, it argues that federal law requires the PUC to use a different rate-setting method for payphone services instead of the traditional method that the PUC used. Appellant relies on 47 USC section 276 (section 276), as amended by the Telecommunications Act of 1996 (the Act), and on orders that the Federal Communications Commission (FCC) has issued pursuant to section 276. Section 276 and those orders, according to appellant, have fundamentally changed the method for setting rates for payphone services that Bell operating companies (BOCs), including Qwest, provide to PSPs.[5] The fundamental shift is that section 276 requires the PUC to focus on a BOC's cost of providing the specific payphone service at issue rather than

[3] For example, the service will prevent customers from making long distance calls at the local call rate.

[4] Qwest's own payphone lines receive CustomNet service. It is not clear from the order whether the PUC treated Qwest as a PSP in making this calculation, whether Qwest's payphone lines are included in the 37 percent that are not PSP lines, or whether they are excluded from the calculation entirely.

[5] BOCs are those LECs that were part of the former Bell System, which provided the great majority of local telephone service throughout the country, and their successors. They are listed in 47 USC section 153(4)(A) as they existed at the Act's adoption. Section 276 applies primarily to BOCs, not to other LECs.

on its total rate of return, thereby allowing PSPs to compete with the BOC's own payphones on a more equal footing. According to appellant, the PUC erred because it failed to apply the FCC's approach.

■    We begin our analysis by examining the overall purpose of the Act, which is to promote competition in the telecommunications industry. Section 276 describes its specific purpose as "to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public[.]" Section 276(b)(1). For many years, LECs were the sole providers of payphone services. The traditional regulatory approach permitted them to subsidize their payphone services from their earnings on other services, a practice known as cross-subsidization. Section 276 prohibits such cross-subsidization for LECs that are also BOCs. Section 276(a) provides:

> "After the effective date of the rules prescribed pursuant to subsection (b) of this section, any Bell operating company that provides payphone service—
>
> "(1)    shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and
>
> "(2)    shall not prefer or discriminate in favor of its payphone service."

As the District of Columbia Circuit Court of Appeals has explained, this section "is designed to replace a state-regulated monopoly system with a federally facilitated, competitive market." *New England Public Communications v. F.C.C.*, 334 F3d 69, 77 (DC Cir 2003).

Section 276(b) requires the FCC to prescribe regulations to implement the statute in ways that will achieve five specific goals. One of those goals is to provide nonstructural safeguards to prevent cross-subsidization that, at a minimum, include the standards that the FCC had previously adopted for certain new telecommunications services and that are known as the Computer III standards. Section 276(b)(1)(C). Finally, section 276(c) provides that, "[t]o the extent that any State requirements are inconsistent with the

Commission's regulations," the regulations preempt those state requirements.

The FCC has not promulgated regulations under section 276 in accordance with the procedures described in 5 USC section 553. However, it has issued several detailed orders to resolve issues under the section, two of which directly apply to this case. The first is an order of the FCC's Common Carrier Bureau (CCB), *In the Matter of Wisconsin Public Service Commission*, CCB/CPD No. 00-1 (2000) (the Wisconsin Order).[6] At the time of the PUC's decisions in this case, the Wisconsin Order was the most recent statement of the FCC's position, but it was under appeal to the full commission. Shortly after the PUC issued its decision on reconsideration in this case, the full commission issued the second order, its decision on the appeal, *In the Matter of Wisconsin Public Service Commission Order*, Bureau/CPD No. 00-01 (2002) (the New Services Order). The FCC modified the Wisconsin Order in some respects but generally affirmed it. The District of Columbia Circuit subsequently affirmed the New Services Order on judicial review. *New England Public Communications*, 334 F3d at 79.

Before the PUC, appellant relied on the Wisconsin Order to support its position regarding the effect of section 276. On appeal, it relies both on that order and on the New Services Order. Qwest and the PUC counter that, for at least two reasons, those orders are not a statement of the law that either the PUC or we must follow. First, they point out that only the Wisconsin Order existed at the time that the PUC acted and that the New Services Order modifies the Wisconsin Order in some respects. From those premises, they conclude that the Wisconsin Order was not the final word on the issues that it discussed and that the PUC did not err in refusing to rely on it. They also argue that, because the PUC had no opportunity to consider the New Services Order, it cannot have erred by failing to follow it. The problem with those arguments is that they ignore the preemptive effect of section 276.

---

[6] We describe the FCC orders by the names that the parties use for them.

The District of Columbia Circuit Court of Appeals treats the FCC's orders under section 276 as binding on every state, and so do we. In affirming the New Services Order, the court stated that the "Commission implemented section 276 in a series of orders," including the New Services Order. *New England Public Communications*, 334 F3d at 71. It further explained that that order "establishes a rule that affects payphone line rates in every state," rather than being limited to Wisconsin, as Qwest and the PUC assert. *Id.* at 75. The PUC must reconsider its order in light of the New Services Order and other relevant FCC orders.[7]

Reversed and remanded with instructions to remand to the PUC for reconsideration.

**WOLLHEIM, J.,** concurring.

I agree with the majority's decision to remand this case to the PUC.[1] The majority does not, however, consider a number of issues that I think are ready for our resolution at this time. Because I would reach those issues as part of deciding this case, I concur in order to describe how I would decide them.

Before the PUC appellant argued that section 276 required the PUC to set rates in accordance with the principles in the statute and in the FCC's previous orders. It relied on the Wisconsin Order to support its position concerning what the statute and those previous orders required. By arguing that the PUC should follow the Wisconsin Order, appellant was arguing that that order correctly applied section 276 and the FCC's previous orders and that the PUC was required to apply those orders to this case. The issue for the PUC was to determine the effect of section 276 on Qwest's proposed rates for payphone service; appellant's reliance on the Wisconsin Order was, in effect, reliance on all of the FCC's decisions on that issue. The issue before us is whether the PUC's order is unlawful because it failed to conform to the requirements of section 276 as the FCC has established

---

[7] The concurrence describes a number of specific problems that it finds in the PUC's order. Although we do not find it necessary to consider those issues at this time, we do not necessarily disagree with the concurrence's discussion.

[1] I use the same acronyms and short titles that the majority uses.

them. *See* ORS 756.590. In making that determination I must consider all relevant sources related to those issues, whether or not they existed at the time that the PUC acted. *Cf. State v. Jury*, 185 Or App 132, 136, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003) (appellate court generally determines error based on law as it exists at time of appellate decision, not time of trial court decision). Because the New Services Order is the FCC's most recent statement of its position, that order will play a significant role in my analysis.

Qwest and the PUC also argue that the FCC's orders are not binding on the PUC, in part because they are orders rather than formally adopted regulations and in part because they apply only to four LECs in Wisconsin. Neither argument is correct. The FCC treats its orders as containing the regulations that the statute requires it to issue, stating in a recent order that "[i]n a series of orders starting in 1996, the Commission *promulgated pay telephone service regulations to implement section 276 of the Act*, as amended by the Telecommunications Act of 1996[.]" *In the Matter of Request to Update Default Compensation Rate for Dial-Around Calls from Payphones*, ¶ 2, WC Docket No. 03-225 (2004) (emphasis added). In the New Services Order, it explained that its discussion would "assist states in applying the new services test" in order to ensure compliance with section 276 and the FCC's previous orders. New Services Order, ¶ 2. It also noted that in a previous order it had preempted all state rules that were inconsistent with the Computer III nonstructural safeguards. *Id.* at ¶ 15. I agree with the majority that those orders are binding on every state.

In all of its orders the FCC, consistently with the criteria in section 276(b)(1), has emphasized the general deregulatory and procompetitive nature of the Act. In essence, a BOC must place its own payphones on an equal footing with those that PSPs operate, and it must not obtain a profit from PSP payphones. In order to achieve that result, the FCC requires BOCs to provide payphone services at rates that satisfy the cost-based "new services test" that it had previously developed in the Computer III order and that Congress expressly required it to apply to payphone rates. Under

that test, the cost for a service should be the direct cost of providing the service, together with an appropriate level of overhead costs. *New England Public Communications v. F.C.C.*, 334 F3d 69, 71-72 (DC Cir 2003). That approach is different from the traditional regulatory approach of adjusting rates with limited regard to the cost of individual services but, instead, with a focus on the utility's total return on its rate base.

In the Wisconsin Order, the CCB summarized its understanding of the FCC's previous payphone orders,[2] explaining the criteria that it would apply in reviewing the rates based on the Computer III requirements and previous FCC orders. First, an LEC must demonstrate that its proposed rates "do not recover more than the direct costs of the service plus 'a just and reasonable portion of the carrier's overhead costs.' " Those costs "must be determined by the use of an appropriate forward-looking, economic cost methodology" that is consistent with the FCC's previous orders. Wisconsin Order, ¶ 9 (quoting 47 CFR § 61.49(f)(2)).[3] In calculating direct costs, the LEC should use methodologies that are consistent with those used in computing rates for other services offered to competitors. *Id.* at ¶ 10.

Secondly, the LEC must justify the methodology that it used to determine its overhead costs. If it does not do so, it may not recover a greater share of overhead in the payphone rates than it does in rates for comparable services. Other services that the LEC provides to competitors are the most likely comparable services for this purpose. "Given that the new services test is a cost-based test, overhead allocations must be based on cost, and therefore may not be set artificially high in order to subsidize or contribute to other LEC services." Wisconsin Order, ¶ 11. Finally, in order to avoid

---

[2] The case came before the FCC under its direct regulatory authority because the Wisconsin Public Services Commission had concluded that it did not have the jurisdiction under state law to apply the requirements of section 276 in a rate-making proceeding. The CCB required the four largest LECs in that state to file their tariffs and supporting information concerning their payphone services with the CCB so it could review their rates for compliance with section 276.

[3] 47 CFR section 61.49(f)(2) describes information that certain LECs must file to support rates for certain new services. Its requirements are not limited to payphone services.

double recovery of costs, an LEC must demonstrate that it has taken into account other sources of revenue that it used to recover the costs of the facilities provided. The order listed several specific other charges that the LEC had to deduct from the payphone rates. *Id.* at ¶ 12.

On appeal, the FCC generally agreed with the CCB. It emphasized that the Commission requires that BOC[4] payphone rates be cost-based. New Services Order, ¶ 42. It described the new services test as flexible and cost-based and emphasized that the methodologies used must be forward-looking and, thus, not based on a particular return on an existing rate base. *Id.* at ¶ 43. Section 276 and the FCC's previous orders had established "a new regulatory regime for payphone services," requiring the use of the new services test whether or not the service was literally "new." *Id.* at ¶ 46. The test is flexible because a state may use any pricing methodology that meets the criteria that the FCC described. The FCC stated that two specific commonly used methodologies would meet those criteria. *Id.* at ¶ 49.

Under the new services test a price consists of two elements: the actual cost of providing the service and a reasonable contribution to overhead. The Wisconsin Order emphasized that overhead allocations must themselves be based on cost and may not be artificially high in order to subsidize or contribute to other LEC services. The Wisconsin Order required LECs to use a specific method, unbundled network elements (UNE) loading, in order to calculate overhead and required them to explain overhead allocations that significantly departed from those amounts. New Services Order at ¶ 51. In the New Services Order the FCC agreed with the CCB that overhead allocations must be based on cost and may not be artificially high. It agreed that UNE loading was a proper method to determine the ceiling for overhead, but it indicated that other methods were also permissible and might be preferable. *Id.* at ¶ 52. One of those possibilities was to compute the direct costs of services that competed with services offered by competitors, to subtract

---

[4] Because of its conclusion that section 276 applies only to BOCs, the FCC did not discuss payphone pricing for other LECs. New Services Order, ¶ 42.

those costs from the lowest rates for those competitive services, and to treat the difference as representing the contribution to overhead. A BOC could then set overhead for the rate being determined at the lowest overhead rate for those competitive services. *Id.* at ¶ 53.

The LECs argued to the FCC that a BOC may apply to PAL rates whatever markup it uses in business line rates. The LECs made that argument even though business line rates may include subsidies for other services. The FCC rejected it. BOCs do not have virtually unlimited flexibility in determining the overhead component of PAL rates. Rather, they must affirmatively justify their overhead allocations. New Services Order at ¶¶ 55, 56. The evaluation of overhead allocations is fact-specific, and the LECs' suggestion that a wide range is reasonable is incorrect. "Consistent[ly] with Commission precedent, the BOCs bear the burden of justifying their overhead allocations for payphone services and demonstrating compliance with our standards." *Id.* at ¶¶ 57, 58. Finally, the FCC modified the Wisconsin Order concerning whether cost based rates must be reduced to take account of certain federally tariffed charges. It agreed with the CCB as to one such charge but not as to another. *Id.* at ¶¶ 59-61.

On appeal, appellant argues that the PUC failed to follow federal law in setting rates for payphone services. It also argues that section 276 requires Qwest to provide far more detailed information, including engineering and time and wage studies, concerning its direct and overhead costs than the PUC required. That information is necessary, appellant says, so the PUC can set Qwest's PAL rates based on its actual costs. Appellant specifically objected to Qwest adding a market-driven return factor to its PAL rates instead of basing them strictly on cost and overhead. I first describe the PUC's orders and then evaluate them in light of the New Services Order.

In its original order, which resolved many issues concerning Qwest's overall rate schedule in addition to the payphone issues, the PUC generally rejected appellant's arguments.[5] It summarized the FCC's requirements as being

---

[5] The PUC refused to rely on the Wisconsin Order on the grounds that it applied only to the specific Wisconsin LECs that it named, that it was on appeal, and that the appealing parties had requested a stay.

that PAL rates be cost based, encourage the deployment of payphones, be nondiscriminatory, and pass the new services test, which the PUC described as requiring that rates be cost based with reasonable overhead. It found appellant's reading of the requirements, in particular the amount of information needed to make the necessary determinations, to be overly formal. Instead of seeking detailed information in order to make a new determination of costs, as appellant requested, the PUC decided that costs determined in UM 773, a previous PUC proceeding, were a reasonable approximation of Qwest's direct costs. It noted that Qwest used those costs to figure its direct costs. The PUC then concluded that the cost-to-price ratio based on those costs was sufficient to infer the overhead on payphone rates. Qwest's rates for payphone services were between 26 and 91 percent above direct costs, which the PUC stated was a reasonable ratio. It noted that the FCC and other state commissions had approved overhead loadings up to 4.8 times direct costs. The PUC rejected appellant's argument that cost based rates had to be set at cost. Rather, it stated, that it is permissible to include contribution[6] and a market driven return in those rates.

The PUC next rejected appellant's argument that CustomNet is subject to the new services test. It concluded that only payphone specific services are subject to that test and that CustomNet is not payphone specific. Rather, it is a retail tariffed service that any customer may purchase, and 37 percent of the lines with it serve customers other than PSPs. Finally, the PUC decided that Qwest could include federally tariffed charges in its rates; it notes that Qwest includes those charges in the rates for all access lines, including the lines that it provides to its own payphone division.[7] PUC Order, 56.

---

[6] The meaning of "contribution" is not clear from the record. Appellant treats it as meaning contribution from PAL rates to other Qwest services rather than contribution to overhead. It is thus an amount in addition to overhead. My subsequent discussion is based on that understanding.

[7] On reconsideration, the PUC adhered to those conclusions, emphasizing that the FCC had described the new services test as flexible. It described appellant's view of the new services test and the necessary supporting material as overly formalistic.

I first consider appellant's challenges to the rates for PALs. Although Qwest has the burden of proving the reasonableness of its rates to the PUC, New Services Order, ¶ 56, on review of the PUC's order appellant has the burden "to show by clear and satisfactory evidence that the order is unreasonable or unlawful." ORS 756.594. Appellant first argues that the PUC failed to comply with the requirement that the rates be based "on the direct costs of the service, plus 'a just and reasonable portion of the carrier's overhead costs.'" New Services Order, ¶ 23 (quoting Wisconsin Order, ¶ 9). I first consider the PUC's determination of Qwest's direct costs. The PUC based its determination of those costs on a previous proceeding, UM 773, stating that the costs from that proceeding are "a reasonable approximation of direct costs." The FCC's orders, however, do not contemplate "a reasonable approximation"; rather, they contemplate a determination of direct costs through the use of an appropriate forward-looking economic cost methodology. The FCC has expressly approved two such methodologies and has indicated that others may also be permissible. The PUC's order does not discuss the methodology that it used in UM 773 or otherwise show that it satisfies the FCC's requirements. Without that information it was impossible for the PUC to conclude that it had a sufficient basis for finding that Qwest met its burden before the agency. Thus, appellant has carried its burden before us of showing that the PUC's order is unlawful in this respect.[8]

The PUC erred in a number of other respects. First, it set PAL rates at the same rate for business services without separately evaluating the direct costs and contribution to overhead for PALs and without considering whether the business rates include a contribution to other services. As the New Services Order indicates, that is inconsistent with the fundamental purpose of section 276 to set payphone rates at a level that will permit PSPs to compete with BOC payphones on an even footing. *See* New Services Order, ¶ 54.

---

[8] Appellant also argues that the PUC should have required Qwest to provide specific information concerning its costs. Because, in my view, the PUC on remand will have to determine whether the methodology of UM 773 was appropriate and, if not, what other methodology it will use, and because the methodology that the PUC chooses may well affect what evidence is relevant, I do not need to discuss that issue at this time.

Unless business line rates are themselves based on the new services test, they are not an appropriate standard for PAL rates. Secondly, for the same reason including contributions to other Qwest services and a market-driven return for Qwest in the rates is impermissible. The requirement that rates be based on costs plus overhead by itself prohibits any market-driven premium over those levels.

Third, the PUC failed to follow the requirements for determining the overhead portion of a PAL rate. It relied primarily on the ratio between Qwest's direct costs and its prices to determine the amount of overhead in its PAL rates and then found that that ratio was permissible in light of the FCC's previous decisions that permitted ratios of overhead to costs as high as 4.8 to 1. PUC Order, 55. There are at least two problems with the PUC's approach. First, the FCC allows the use of the ratio between direct costs and prices only for competitive services, and it requires that those costs be deducted from the lowest rates charged for those competitive services in order to determine the contribution to overhead "from these competitive services." New Services Order, ¶ 53. There is nothing that permits using that approach for the noncompetitive rates that the PUC considered. In addition, the FCC has explained that the decision in which it permitted high overhead loadings was an unusual situation in which the LEC provided adequate justification and that involved payphone features that cost only a few cents per line per month. *Id.* at ¶ 57. Although state regulators may use a flexible approach to calculating the overhead allocation to PALs, *id.* at ¶ 58,

> "BOCs bear the burden of affirmatively justifying their overhead allocations. In general, in our decisions applying the new services test to services offered to competitors, we have allowed BOCs some flexibility in calculating overhead allocations, but we have carefully reviewed the reasonableness of BOCs' overhead allocations. We have *not* simply accepted any 'plausible benchmark' proffered by an [*sic*] BOC."

*Id.* at ¶ 56 (emphasis in original).

The PUC did not require Qwest to meet the burden that the FCC requires. Rather, it assumed that Qwest's non-competitive rates included a reasonable ratio of overhead and

simply applied that ratio to its PAL rates, approving business line and PAL rates that were essentially identical. On remand, it should evaluate Qwest's costs and overhead in accordance with the requirements of the New Services Order, ensuring that it has sufficient information to do so.[9] Section 276 requires a new approach to rates for payphone services; it may be difficult to satisfy the requirements of that section by simply tinkering with the traditional regulatory approach.

The remaining issue is whether CustomNet is subject to the New Services Order. It is clear that the new services test applies to all payphone specific services. Although CustomNet is primarily a payphone service that Qwest uses on its own payphones, a significant number of non-PSPs also use it. The FCC has rejected the argument that a BOC can avoid applying the new services test to a particular service simply by tariffing it in a nonpayphone specific way. New Services Order, ¶ 64 n 139. It has also held that call screening is a payphone specific service. The parties have not pointed to any FCC decision concerning whether a payphone specific service is exempt from the new services test because it is also available to, and actually used by, nonpayphone customers. In its order the PUC assumed that such services are exempt. In making that assumption, it did not consider the underlying purpose of section 276 and the new services test, which is to reduce rates for PALs and related services to the level of the BOC's direct costs and overhead in order to encourage competition in providing payphone services. To permit Qwest to supply a needed payphone service at a rate above that level is inconsistent with that purpose and may be inconsistent with the FCC's orders. Because the PUC did not consider that issue from the correct perspective, its decision is not lawful. I would require it to reconsider the question on remand.

I concur in the majority's opinion.

---

[9] This includes the requirement that Qwest must reduce its PAL rates by the amount of a specific federally tariffed charge. New Services Order, ¶ 61.