Argued and submitted January 20, 2015, affirmed July 27, 2016

NORTHWEST PUBLIC
COMMUNICATIONS COUNCIL,
on behalf of PSPs A to Z; NPCC Members;
and Central Telephone, Inc., et al.,
*Petitioner,*

*v.*

QWEST CORPORATION;
Oregon Public Utilities Commission;
and Stephen Bloom, Susan Ackerman and John Savage,
in their capacity as Commissioners.
*Respondents.*

Public Utility Commission of Oregon
DR26UC600; A150775

379 P3d 633

Richard D. Gaines, Pennsylvania, argued the cause for petitioner. On the briefs was Franklin G. Patrick.

Lawrence H. Reichman argued the cause for respondent Qwest Corporation. With him on the brief was Perkins Coie LLP.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondents Oregon Public Utilities Commission, Stephen Bloom, Susan Ackerman, and John Savage. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

## SERCOMBE, P. J.

Northwest Public Communications Council (NPCC), an association of businesses that provide payphone services to the public, filed a complaint with the Oregon Public Utilities Commission (PUC) in 2001.[1] In that complaint, NPCC asked the PUC to order Qwest Corporation, a Bell Operating Company and local exchange carrier, to pay refunds to NPCC's members relating to certain services Qwest had provided and for which, NPCC asserted, Qwest had charged excessive rates.[2] NPCC seeks judicial review of a final order of the PUC granting Qwest's motion for summary judgment and dismissing NPCC's complaint. In three assignments of error, NPCC raises a number of contentions. Included among those are assertions that the PUC erred in granting Qwest's motion for summary judgment and in denying NPCC's request to amend its complaint to add additional claims for refunds. We reject NPCC's contentions,

---

[1] As discussed below, the PUC later allowed NPCC to amend the complaint to specifically name its members as complainants. Throughout this opinion we refer to the complainants simply as NPCC.

[2] Pursuant to ORS 756.500,

"(1) Any person may filed a complaint before the Public Utility Commission, or the commission may, on the commission's own initiative, file such complaint. The complaint shall be against any person whose business or activities are regulated by some one or more of the statutes, jurisdiction for the enforcement or regulation of which is conferred upon the commission. The person filing the complaint shall be known as the complainant and the person against whom the complaint is filed shall be known as the defendant.

"* * * * *

"(3) The complaint shall state all grounds of complaint on which the complainant seeks relief or the violation of any law claimed to have been committed by the defendant, and the prayer of the complainant shall pray for the relief to which the complainant claims the complainant is entitled."

Furthermore, under ORS 756.450,

"[o]n petition of any interested person, the Public Utility Commission may issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by the commission. A declaratory ruling is binding between the commission and the petitioner on the state of facts alleged, unless it is modified, remanded or set aside by a court. However, the commission may review the ruling and modify or set it aside if requested by the petitioner or other party to the proceeding. Binding rulings provided by this section are subject to judicial review as orders in contested cases in the manner provided by ORS 756.610."

See also ORS 756.610(1) ("[F]inal orders of the Public Utility Commission are subject to judicial review as orders in contested cases under the provisions of ORS 183.480 to 183.497 [of the Administrative Procedures Act].").

many of them without published discussion, and affirm the PUC's order.

## LEGAL BACKGROUND

"Once upon a time, the only way to call home from a roadside rest stop or neighborhood diner was to use a payphone." *Illinois Public Telecommunications Ass'n. v. F.C.C.*, 752 F3d 1018, 1020 (DC Cir 2014).

> "Since the mid-1980s, independent payphone providers have competed with Bell Operating Companies in the consumer payphone market. At first, Bell Operating Companies had a built-in advantage. In addition to operating some payphones, Bell Operating Companies owned the local phone lines that provide service to *all* payphones. An independent payphone provider was thus 'both a competitor and a customer' of the local Bell Operating Company. *Davel Communications, Inc. v. Qwest Corp.*, 460 F3d 1075, 1081 (9th Cir 2006). And that Bell Operating Company could exploit its control over the local phone lines by charging lower service rates to its own payphones or higher service rates to independent payphone providers."

*Id.* (emphasis in original).

"In 1996 Congress amended the Federal Communications Act * * * of 1934 in part to improve competition in the telecommunications industry in the wake of the breakup of the former AT & T into Bell Operating Companies." *Northwest Public Commc'n Council v. Oregon Public Utility*, 805 F Supp 2d 1058, 1061 (D Or 2011). "To prevent unfair competition in the payphone market, Congress included a payphone provision" in the 1996 Act. *Illinois Public Telecommunications Ass'n.*, 752 F3d at 1020; *see* 47 USC § 276. That provision, codified as 47 USC section 276(a), provides that a Bell Operating Company may not "subsidize its payphone service directly or indirectly" or "prefer or discriminate in favor of its payphone service." To implement that directive, in subsection (b) of section 276, Congress directed the Federal Communications Commission (FCC) to "prescribe regulations" governing rates charged by Bell Operating Companies. Among other things, in section 276(b),

> "Congress ordered the FCC to 'establish a per call compensation plan to ensure that all payphone service providers

are fairly compensated for each and every completed intra-state and interstate call using their payphone.' 47 USC § 276(b)(1)(A). That provision responded to the development of long-distance access codes and 800 numbers that allowed callers to use payphones without depositing coins, thereby depriving payphone operators of revenue. The FCC issued a rule requiring the long-distance carriers who benefitted from such 'dial-around' calls to compensate payphone providers."

*Illinois Public Telecommunications Ass'n.*, 752 F3d at 1026.

Specifically, pursuant to Congress' directive, the FCC issued a series of orders intended to implement the requirements of the 1996 Act. *See Northwest Public Communications Council v. PUC*, 196 Or App 94, 100, 100 P3d 776 (2004) ("The District of Columbia Circuit Court of Appeals treats the FCC's orders under section 276 as binding on every state, and so do we."). The Ninth Circuit summarized those orders in *Davel Communications, Inc.*, 460 F3d at 1081-83:

"Pursuant to th[e] directive [in 47 USC section 276(b)], the FCC adopted regulations requiring local exchange carriers such as Qwest to set payphone service rates and 'unbundled features' rates, including rates for fraud protection, according to the FCC's 'new services test' (sometimes 'NST'). The new services test requires that rates for those telecommunications services to which it applies be based on the actual cost of providing the service, plus a reasonable amount of the service provider's overhead costs. The FCC's regulations required local exchange carriers to develop rates for the use of public access lines by intrastate payphone service providers that were compliant with the new services test. The rates were to be submitted to the utility commissions in the states in the local exchange carriers' territory, which would review and 'file' (*i.e.*, approve) the rates. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Report and Order, FCC 96-388, 11 FCCR 20,541 (Sept 20, 1996); *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Order on Reconsideration, FCC 96-439, 11 FCCR 21,233 (Nov 8, 1996) ¶ 163 ("Order on Recons.") (collectively 'Payphone Orders'). Also pursuant to the regulations, local

exchange carriers were required to filed their 'unbundled features' with both the state commissions and the FCC for approval. Order on Recons. ¶ 163. The FCC required the local exchange carriers to file the new tariffs for both kinds of rates by January 15, 1997, with an effective date no later than April 15, 1997. *Id.*

"In addition, the Payphone Orders required interexchange carriers, mainly long distance telephone service providers, to pay 'dial-around compensation' to payphone service providers, including Qwest, for calls carried on the carrier's lines which originated from one of the provider's pay telephones. If, however, the payphone service provider was also an incumbent local exchange carrier, as was Qwest, the Payphone Orders required full compliance with the new tariff filing requirements, including the filing of cost-based public access line rates and fraud protections rates, before the local exchange carrier could begin collecting dial-around compensation.

"On April 10, 1997, a coalition of regional Bell operating companies ('the Coalition'), which included Qwest, sent a letter to the FCC requesting a limited waiver of certain provisions of the Payphone Orders. The Coalition wanted this waiver so that the constituent companies could begin collecting dial-around compensation before they were in full compliance with the new regulations. Specifically, they requested an extension of time to file intrastate payphone service rates compliant with the new services test. These rates were due to become effective on April 15, 1997, but the Coalition wanted that deadline extended forty-five days from April 4, 1997. (The FCC had earlier granted a similar extension with respect to interstate rates.) The Coalition proposed that, if the FCC granted the waiver and allowed the Coalition companies to file rates that complied with the new services test by the extended deadline, those companies would reimburse or provide a credit back to April 15, 1997, to customers purchasing the services if the new rates were lower than the previous non-compliant rates.

"On April 15, 1997, the FCC issued an order granting a limited waiver of the new services test rate-filing requirement. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Order, DA 97-805, 12 FCCR 21,370 (Apr 15, 1997) ('Waiver Order'). Specifically, the Waiver Order granted an extension until May 19, 1997,

for filing intrastate payphone service rates compliant with the new services test, while at the same time permitting incumbent local exchange carriers to begin collecting dial-around compensation as of April 15, 1997. *Id.* ¶ 2. The Waiver Order stated that the existing rates would continue in effect from April 15, 1997, until the new, compliant rates became effective ('the waiver period'). The NST-compliant rates were to be filed with state utility commissions, which were required to act on the filed rates 'within a reasonable time.' *Id.* ¶ 19 n 60; *see also id.* ¶¶ 2, 18-19, 25. If a local exchange carrier relied on the waiver, it was required to reimburse its customers 'from April 15, 1997 in situations where the newly [filed] rates, when effective, are lower than the existing [filed] rates.' *Id.* ¶¶ 2, 20, 25. The order emphasized that the waiver was 'limited' and 'of brief duration.' *Id.* ¶¶ 21, 23."

(Third and fourth brackets in original; footnote omitted.)

## FACTS AND PROCEDURAL HISTORY

The background facts and procedural history of this case are as follows. NPCC is a regional trade organization that represents companies providing public payphone services. Some of NPCC's members purchase payphone services from Qwest, which owned nearly 80 percent of the payphone lines in Oregon until it sold its payphone services business in 2004.

Under the Payphone Orders, local exchange carriers were required to file tariffs for intrastate public access lines by January 15, 1997, with an effective date no later than April 15, 1997, and, for a local exchange carrier to receive dial-around compensation, the rates filed were to comply with the new services test. Qwest filed new tariffs for public access line service with the PUC on January 15, 1997. It stated that the tariffs were intended to meet the requirements of the Payphone Orders. The PUC approved the rates at its meeting on April 1, 1997, and the approved public access line rates became effective April 15, 1997. The PUC's approval of Qwest's public access line rates was not appealed.

On April 15, 1997, the FCC adopted and released the Waiver Order, which granted an extension until May 19,

1997, for filing intrastate payphone service rates compliant with the new services test, while at the same time permitting local exchange carriers to begin collecting dial-around compensation as of April 15, 1997. Specifically, the Waiver Order states:

> "Because some [local exchange carrier] intrastate tariffs for payphone services are not in full compliance with the Commission's guidelines, we grant all [local exchange carriers] a limited waiver until May 19, 1997 to file intrastate tariffs for payphone services consistent with the guidelines established in the Order on Reconsideration, subject to the terms discussed herein. This waiver enables [local exchange carriers] to file intrastate tariffs consistent with the 'new services' test of the federal guidelines required by the Order on Reconsideration and the Bureau Waiver Order, including the cost support data, within 45 days of * * * April 4, 1997 * * * and remain eligible to receive payphone [dial-around] compensation as of April 15, 1997, as long as they are in compliance with all of the other requirements set forth in the Order on Reconsideration. Under the terms of this limited waiver, a [local exchange carrier] must have in place intrastate tariffs for payphone services that are effective by April 15, 1997. The existing intrastate tariffs for payphone services will continue in effect until the intrastate tariffs filed pursuant to the Order on Reconsideration and this Order become effective. *A [local exchange carrier] who seeks to rely on the waiver granted in the instant Order must reimburse its customers or provide credit from April 15, 1997 in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates.* This Order does not waive any of the other requirements with which the [local exchange carriers] must comply before receiving compensation."

Waiver Order at ¶ 25 (emphasis added). Qwest did not file new rates between April 15, 1997 and May 19, 1997; instead, it relied on the rates that had been approved by the PUC effective April 15, 1997. On May 20, 1997, Qwest sent a letter to carriers who would be required to pay dial-around compensation. In that letter, Qwest certified that it met all the requirements, including compliance with the new services test, to receive dial-around compensation from carriers in Oregon.

During that time period, Qwest had a general rate proceeding pending before the PUC. As part of that case, NPCC argued that Qwest's public access line rates did not comply with the new services test. In 2001, the PUC approved new public access line rates for Qwest, and NPCC appealed. *See Northwest Public Communications Council,* 196 Or App 94. We remanded the case to the PUC to consider whether the approved rates met the new services test. *Id.* at 100. In 2003, while that appeal was pending, Qwest filed new public access line rates and, in 2007, NPCC stipulated that those 2003 rates complied with the new services test. The stipulation was approved by the PUC.

Meanwhile, in May 2001, while the rate case was ongoing, NPCC filed the complaint in this case against Qwest. In its complaint, NPCC alleges that Qwest relied on the Waiver Order and that its "rate setting methodology * * * clearly violated the new services test." According to NPCC, Qwest's rates for public access lines, which went into effect on April 15, 1997, were required to meet the new services test and, to the extent that the rates exceed the new services test, Qwest must pay a refund to its customers, including NPCC, under the Waiver Order. In its complaint, NPCC asks the PUC to enter an order holding that Qwest's public access line rates must meet the new services test but have failed to do so since April 15, 1997, and, therefore, Qwest must pay refunds of all overcharges to NPCC's members and other public access line subscribers under the Waiver Order. In NPCC's view, all public access line subscribers "are entitled to refunds of all overcharges, as required by the FCC's *Waiver Order,* based on the amount by which the rates charged since April 15, 1997 exceeded the * * * rate established in [the rate case], less any refunds already paid in [the rate case]."

The parties filed a stipulated motion in which they moved that the proceedings in this case should be stayed pending entry of a final order by the PUC in the rate case. On June 21, 2001, the PUC granted the stay. By 2004, the stay was no longer in effect and the parties filed cross-motions for summary judgment. The issue raised in those motions was Qwest's liability to pay refunds under the Waiver Order. In NPCC's view, it was entitled to summary judgment because,

based on the undisputed facts, Qwest was liable to pay refunds under the Waiver Order. In Qwest's view, the opposite was true: Because Qwest did not file any new tariffs within the 45-day extension granted by the Waiver Order, it did not rely on the order and, therefore, was not liable for refunds under the Waiver Order.

In March 2005, a hearing was held before an administrative law judge (ALJ) to discuss "why [the] proceeding should not be held in abeyance pending the outcome of" proceedings that were then pending before the FCC. After the hearing, on March 23, 2005, the ALJ issued a ruling concluding that the matter should be held in abeyance.

The issue in the cross-motions for summary judgment was "whether the *Waiver Order* requires Qwest to refund a portion of the intrastate Payphone Access Line * * * rates paid by Payphone Service Providers * * * since April 15, 1997, because those rates do not comply with the 'New Services Test' * * * established in the FCC's *Payphone Orders*." However, the ALJ observed, "Oregon is not the only jurisdiction where an outstanding controversy exists concerning whether refunds are owed by a [Bell Operating Company and local exchange carrier] for failure to implement [new services test]-compliant rates on April 15, 1997." Rather, consolidated cases pending before the FCC raised the issue of "whether the FCC's *Payphone Orders*, including the *Waiver Order*, require [Bell Operating Companies] to refund [payphone access line] rates retroactive to April 15, 1997, to the extent that [new services test]-compliant rates are determined to be less than the rates that were actually charged to" payphone service providers. Because the threshold question in the case concerned the refund obligation contemplated under the Waiver Order and "[t]hat issue and other related matters [were] squarely before the FCC," the ALJ concluded that it made "sense to allow the FCC the opportunity to provide guidance to the states concerning the proper interpretation of" its orders. In the ALJ's view, the FCC was "in the best position to articulate what its decisions require." Accordingly, the ALJ ruled that this case would be held in abeyance pending the FCC's decision on the pending consolidated cases. On May 3, 2005, the PUC affirmed the ALJ's ruling.

After several years had passed, in January 2009, although the FCC had not yet ruled on the cases before it, having "lost patience with the FCC," NPCC moved to lift the order holding this case in abeyance. NPCC's motion, which Qwest did not oppose, was granted in February 2009. The same month, NPCC filed a motion seeking to amend its complaint.[3]

In its motion, NPCC sought to add allegations to its complaint for refunds relating to alleged overcharges by Qwest relating to a service that NPCC referred to as "CustomNet," a fraud-prevention service that "prevents the billing of certain calls, such as operator-assisted long distance calls, to the payphone from which the call is placed." NPCC also sought to "add its members as additional named complainants." Qwest opposed the amendments and, as to the addition of the allegations relating to CustomNet, asserted that the amendments "would change the nature of the current case" and prejudice Qwest. Furthermore, Qwest asserted that the claims relating to CustomNet were barred by the applicable statute of limitations.

The PUC entered an order granting NPCC's request to add named complainants to the case and otherwise denying the motion to amend. With respect to the denial of NPCC's request to add claims for CustomNet overcharges, the PUC noted that, in determining that the case should be held in abeyance, the presiding ALJ had stated that

> "[t]he threshold question presenting in this proceeding concerns *the scope of the refund obligation contemplated by the FCC's Payphone Orders* * * *. Since the [Bell Operating Companies'] refund liability under the *Payphone Orders* is ultimately a question of federal law, it makes sense to allow the FCC the opportunity to provide guidance to the states concerning the proper interpretation of those orders. While this Commission could certainly opine on what the FCC intended in its *Payphone Orders*, the FCC itself is in the best position to articulate what its decisions require. * * * In my view, it makes little sense to expend time and resources litigating this matter before [the PUC] and state courts when it is unlikely to produce a final outcome, especially

---

[3] Under ORS 756.500(4), a "complaint may, at any time before the completion of taking of evidence, be amended by order of the commission."

when the identical issues are pending before the FCC. \* \* \*
[A]ny potential \* \* \* financial exposure [for Qwest] will
remain until the federal proceedings are finally resolved."

(Emphasis and first, second, and third ellipses in original.)
The PUC explained:

> "More than four years later, the FCC has yet to issue
> its Order in response to the requests for a declaratory rul-
> ing. Although the ALJ's comments remain as true today as
> they were in 2005, NPCC now seeks to *broaden the scope*
> of the case to encompass a service, CustomNet, which may
> or may not be subject to the same set of issues and inten-
> tions regarding refund obligations as are set forth in the
> *Payphone Orders.*"

(Emphasis in original.) In the PUC's view, by adding claims
relating to CustomNet, "we run the risk of obfuscating
what is already an uncertain undertaking and raising the
possibility that the issuance of an FCC order would not
resolve the original complaint because the amendment had
added CustomNet servicers." Under those circumstances,
"we would defeat the very purpose of lifting the abeyance
ruling—providing the parties with a definitive Order
addressing the issues in the original complaint."

The PUC emphasized that NPCC's original com-
plaint "was narrow and explicit," made "no *general* alle-
gations of overcharging by Qwest," and, instead, "took
pains to confine" the allegations to public access line rates.
(Emphasis in original.) Furthermore, "based upon NPCC's
representations," the PUC found "that CustomNet service
purchases were severable" from public access line services,
and that NPCC "viewed them as such" and, thus, the new
allegations did not relate back to the original complaint.
Accordingly, under the most recent relevant case law, "the
applicable statute of limitations of two years poses an abso-
lute bar to the addition of CustomNet services to the instant
case." For all of those reasons, the PUC declined to allow
NPCC to amend the complaint to add claims for CustomNet
services.

After being granted several extensions of time in
which to file an amended complaint, in November 2009,

NPCC filed a first amended complaint which, in addition to adding complainants as permitted by the PUC's order, also included the allegations relating to CustomNet. The same day, NPCC filed a second amended complaint that included amendments relating to the addition of the new parties and included additional allegations and state law claims that had not been in the original complaint and that were not related to the addition of the new parties. NPCC filed, along with the second amended complaint, a "precautionary" motion to allow the second amended complaint. Qwest filed motions to strike both the first and second amended complaints.

Qwest asked the PUC to strike the first amended complaint because it "fails to comply with the [PUC's order on the motion to amend] by including a claim for refund of CustomNet charges when the Commission unambiguously denied Complainants permission to add such a claim to this case." In its motion to strike the second amended complaint and response to the "precautionary" motion, Qwest asserted that the second amended complaint also did not comply with the PUC's order because it included a claim for refunds of CustomNet charges. In addition, Qwest asserted that the second amended complaint should be stricken because, in addition to the CustomNet claims, it also included a number of other claims that would significantly expand the scope of the case.

The PUC ruled on those motions in February 2010, striking the second amended complaint in its entirety and granting, in part, the motion to strike the first amended complaint. The PUC noted that, in its order on the motion to amend, it had "made abundantly clear that the sole allowed purpose of an NPCC Amendment was to permit the NPCC member" payphone service providers to be named in the complaint. However, in both its first and second amended complaints, NPCC sought to "collaterally attack" the PUC's prior order, essentially claiming that the prior rulings were not binding once the new parties were added to the complaint. Concluding that NPCC's position was without merit, the PUC ordered that the first amended complaint would be allowed only to the extent that it included allegations relating to public access line charges and listed the new parties

as complainants to be joined. NPCC was ultimately given until February 17, 2010, to file its third amended complaint. However, it failed to do so.[4]

On April 30, 2010, Qwest again filed a motion seeking summary judgment. It asserted that it had not relied on the FCC's Waiver Order in Oregon and, therefore, the obligation to pay refunds under the Waiver Order was never triggered. Specifically, according to Qwest, the refund obligation in the Waiver Order applied only to Bell Operating Companies "who filed new or revised tariffs by May 19, 1997." Qwest also asserted that "the refund period under the Waiver Order was limited to up to 45 days, and was not open-ended."[5] NPCC disagreed with Qwest's understanding of what it meant to "rely upon" the Waiver Order. It asserted that NPCC did not have new services test-compliant rates in effect as of April 15, 1997, but started collecting dial-around compensation on the date. Thus, in NPCC's view, Qwest necessarily relied on the Waiver Order. It asserted that, in the absence of reliance on the Waiver Order, Qwest could not receive dial-around compensation as of April 15, 1997, unless, by that date, its rates had been reviewed and approved as compliant with the new services test by the FCC or the PUC.[6] NPCC also contended that Qwest was judicially estopped from disputing that it was required to pay refunds under the Waiver Order. Specifically, it contended that, as one of the companies that requested the Waiver Order, Qwest had represented to the FCC that it would provide refunds if it relied on the Waiver Order and its final rates were less than those in effect on April 15, 1997, and,

---

[4] The parties and the PUC appear to have proceeded based on the allegations as set forth in the initial complaint, with the understanding that NPCC's members had been added as parties. NPCC made clear that, in light of the PUC's decision on the motions to amend and motions to strike, "the only *** claim in this case is the claim for refund under the Waiver Order." And, on judicial review, NPCC's arguments discuss the allegations and claims in the initial complaint and the PUC's understanding of that complaint.

[5] Qwest also argued, alternatively, that the refund claim was barred by the two-year statute of limitations.

[6] Strangely, NPCC also asserted that the PUC lacked subject matter jurisdiction over its claims. To the extent that NPCC continues to allude on judicial review to a contention that the PUC lacked jurisdiction over its claim, we observe that that position would appear to counsel in favor of the PUC's dismissal of NPCC's complaint.

therefore, Qwest could not argue that it was not liable for refunds.

In December 2011, the PUC granted Qwest's motion for summary judgment. Noting that NPCC acknowledged that the only claim in this case "is the claim for refund under the Waiver Order, the PUC observed that, accordingly, the central question to be addressed was whether the Waiver Order applies. Ultimately, the PUC agreed with Qwest that the refund obligation in the Waiver Order was not triggered in this case, because Qwest had not relied on the Waiver Order. The PUC explained:

> "We agree with Qwest that it is clear from the plain language of the *Waiver Order* that the refund obligation is triggered only if a [local exchange carrier] relied on the waiver to comply with the FCC requirements. The order states:
>
> > "'A LEC *who seeks to rely on the waiver granted in the instant Order* must reimburse its customers or provide credit from April 15, 1997 in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates.'
>
> "If a [local exchange carrier] certified that the tariffs in effect by April 15, 1997, met all of the FCC requirements, including the [new services test], then the [local exchange carrier] met the original filing deadline and did not rely on the waiver of that deadline. In Oregon, Qwest filed an intrastate payphone tariff on January 15, 1997, that was intended to meet all of the FCC requirements. The Commission approved the tariff on April 1, 1997, and the tariff was effective April 15, 1997. Qwest did not file another payphone tariff between April 4, 1997, and May 19, 1997. Instead, Qwest certified on May 20, 1997, that the tariff in effect in Oregon on April 15, 1997, met all of the FCC requirements. Qwest therefore did not avail itself of the extension granted in the *Waiver Order*."

(Emphasis in original; footnotes omitted.) The PUC was not persuaded by NPCC's arguments that, even though Qwest did not file new rates within the waiver period, it nonetheless relied on the Waiver Order:

> "Contrary to NPCC's assertions, the *Waiver Order* did not require that intrastate payphone tariffs be reviewed and conclusively determined to be [new services test-]compliant

by May 19, 1997. The order required only that [a local exchange carrier] be able to certify that it had effective state tariffs that met FCC requirements. Qwest made such a certification on May 20, 1997. Nothing in the *Waiver Order* indicates that the FCC required tariffs to be filed, reviewed, approved, and all appeals exhausted before the requirements of the *Payphone Orders* would be deemed satisfied."

Because the Waiver Order was "NPCC's only asserted basis for Qwest's refund liability," and it had concluded that Qwest did not rely on the Waiver Order in Oregon, the PUC granted Qwest's motion for summary judgment and dismissed NPCC's complaint.

In February 2013, after the PUC decided Qwest's motion for summary judgment, and while judicial review of the PUC's order was pending before this court, the FCC finally issued the order that the PUC, Qwest, and NPCC had been waiting for. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Declaratory Ruling and Order, FCC 13-24, 28 FCCR 2615 (Feb 27, 2013) (Clarification Order).[7] In its order, the FCC noted that the "Oregon Public Utility Commission [had] sent a letter to the [FCC] requesting prompt action * * * and specifically asking whether the [Waiver Order] requires refunds of a portion of payphone access line rates back to April 15, 1997 if those rates do not comply with the" new services test. *Id.* at ¶ 36. As requested, the FCC clarified the "refund obligation established in the" Waiver Order. *Id.* at ¶ 45.

It stated that that "order granted a narrow and limited waiver to the [Bell Operating Companies] to permit them a short additional period of time—from April 15, 1997 until May 19, 1997—to file tariffs for payphone lines that comply with the Commission's orders implementing section 276 of the [1996] Act." *Id.* Furthermore, "[w]ith regard to refunds, the [Waiver Order] states, '[a local exchange carrier] who seeks to rely on the waiver granted

---

[7] Trade associations representing independent payphone providers sought judicial review. The DC Circuit denied, in part, and dismissed, in part, the petitions for review, *Illinois Public Telecommunications Ass'n.*, 752 F3d 1018, and the United States Supreme Court denied certiorari, 135 S Ct 1583 (2015).

in the instant Order must reimburse its customers or provide credit from April 15, 1997 in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates.'" *Id.* Thus, under the Waiver Order, "if a [Bell Operating Company] filed a tariff after April 15, 1997, but on or before May 19, 1997, that lowered payphone rates, * * * once that tariff was effective, the [Waiver Order] requires that refunds be paid from April 15, 1997, to the effective date of the tariff." *Id.*[8] The Waiver Order, however, did not address "the applicability of refunds where a carrier filed tariffs after May 19, 1997, or did not file new tariffs, but instead relied on existing rates, or only filed cost studies for existing rates." *Id.* As the FCC observed, those situations "raise very different issues with regard to potential liability for refunds." *Id.* However, the Waiver Order itself "did not impose an open-ended refund obligation." *Id.* at ¶ 46.

Nonetheless, in the Clarification Order, the FCC acknowledged that, under the Payphone Orders, the obligation to file tariffs setting forth new services test-compliant rates was "mandatory," and, "absent a state exemption, a [Bell Operating Company] that filed tariffs after May 19, 1997, or that simply relied on existing rates or filed cost studies for existing rates would have been in violation of [the FCC's] orders." *Id.* at ¶ 45. Under those circumstances, a state commission could order a refund based on sources of authority other than the Waiver Order.[9]

---

[8] In its order, the FCC also noted that the Payphone Orders had "permitted [Bell Operating Companies] to begin receiving dial-around compensation if they were able to self-certify compliance with the requirement that their rates be [new services test-]compliant." Clarification Order at ¶ 7.

[9] According to the FCC, a state commission could "find refunds to be appropriate pursuant to section 276, Commission regulations, and relevant state laws if the rates in such cases were challenged under state regulatory procedures and found to be non-compliant." Clarification Order at ¶ 45. The FCC explained that the Waiver Order "was intended to provide only a limited extension of time within which the [Bell Operating Companies] could file [new services test]-compliant rates," and did not affect "a state commission's authority and obligation to apply relevant law and regulations to determine whether a [Bell Operating Company's] rates were [new services test]-compliant, including whether refunds are appropriate for periods where it finds a [Bell Operating Company's] rates were not [new services test]-compliant." *Id.* at ¶ 47. Under those other authorities, "states may, but are not required to, order refunds for any period after April 15, 1997 that a [Bell Operating Company] does not have [new services test]-compliant rates in effect." *Id.*

## ANALYSIS

On judicial review, NPCC asserts that the PUC erred in granting Qwest's motion for summary judgment, in denying NPCC's request to amend its complaint to add CustomNet claims, and in its ruling on Qwest's motions to strike the first and second amended complaints. On judicial review of the PUC's order, we do not substitute our judgment for that of the agency as to any issue of fact or agency discretion. ORS 183.482(7). Instead, we review to determine whether the PUC correctly applied the applicable law and whether it acted within the scope of its discretion. ORS 183.482(8).

As noted, NPCC asserts that the PUC erred in granting summary judgment in favor of Qwest based on the conclusion that Qwest did not rely on the Waiver Order. To address that contention, we begin by observing, as did the PUC, that the refund claim set forth in NPCC's complaint is based solely on the Waiver Order. As noted, in its complaint, NPCC asserts that Qwest's public access line rates were required to meet the new services test and that the rates in effect on April 15, 1997, exceeded the lawful amount under that test. According to NPCC, public access line subscribers "are entitled to refunds of all overcharges, as required by the FCC's *Waiver Order.*" Thus, the only claim at issue before the PUC was NPCC's claim that public access line subscribers were entitled to refunds under the Waiver Order.

According to NPCC, on summary judgment, the PUC erroneously concluded that Qwest did not rely on the Waiver Order. Again, that order granted all local exchange carriers a limited waiver of the time to file intrastate tariffs for payphone services that complied with the new services test. Specifically, the waiver enabled local exchange carriers "to file intrastate tariffs consistent with the 'new services' test of the federal guidelines required by the Order on Reconsideration and the Bureau Waiver Order, including the cost support data, within 45 days of *** April 4, 1997 *** and remain eligible to receive payphone [dial-around] compensation as of April 15, 1997, as long as they are in compliance with all of the other requirements set forth in Order on Reconsideration." Waiver Order at ¶ 25. Under the

terms of the limited waiver granted in the Waiver Order, a local exchange carrier was required to have in place intrastate tariffs for payphone services that were effective April 15, 1997. A local exchange carrier *"who seeks to rely on the waiver granted in the instant Order* must reimburse its customers or provide credit from April 15, 1997 in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates." *Id.* at ¶ 25 (emphasis added).

As the FCC explained in the Clarification Order, the Waiver Order merely "granted a *narrow and limited* waiver to the [Bell Operating Companies] to permit them a short additional period of time—from April 15, 1997 until May 19, 1997—to file tariffs for payphone lines that comply with the Commission's orders implementing section 276 of the [1996] Act." Clarification Order at ¶ 45 (emphasis added). The terms of the Waiver Order required refunds only in circumstances where a local exchange carrier "filed a tariff after April 15, 1997, but on or before May 19, 1997, that lowered payphone rates." *Id.* The Waiver Order's refund obligation, however, is not "open ended," *id.* at ¶ 46, and does not address circumstances where a local exchange carrier "filed tariffs after May 19, 1997, or did not file new tariffs, but instead relied on existing rates, or only filed cost studies for existing rates." *Id.* at ¶ 45. Those circumstances, instead, "raise very different issues with regard to potential liability for refunds" than those addressed in the Waiver Order. *Id.*

Here, it is undisputed that Qwest did not file new public access line rates between April 15, 1997 and May 19, 1997, and, instead, it relied on its rates that had been approved by the PUC effective April 15, 1997. Under those circumstances, the PUC correctly concluded that Qwest did not rely on the waiver granted in the Waiver Order, and no refund obligation was triggered thereunder. Instead, as noted by the FCC, Qwest's liability for refunds in those circumstances raises "very different issues" than the Waiver Order addresses. Clarification Order at ¶ 45. Although, under the circumstances presented here, "[a] state commission may well find refunds to be appropriate pursuant"

to sources of authority other than the Waiver Order, only a claim for refunds pursuant to the Waiver Order was at issue in this case. *Id.* Thus, the PUC did not err in concluding that "the refund obligation established in [the Waiver Order] was never triggered" and, therefore, as a matter of law, NPCC could not prevail on its claim.

NPCC nonetheless asserts that Qwest is judicially estopped from asserting that it did not rely on the Waiver Order. According to NPCC, Qwest and the other companies that requested the Waiver Order from the FCC represented to the FCC that, "to assure that independent [payphone service providers] would not be damaged by the requested waiver, they would refund" overcharges if it was determined that final rates were lower than the interim rates. In NPCC's view, having obtained the Waiver Order and collected dial-around compensation beginning on April 15, 1997, Qwest cannot now contend that it did not rely on the Waiver Order. That contention is wholly unpersuasive.

"Judicial estoppel is a common law equitable principle that applies to prevent a litigant who has benefitted from a position taken in an earlier judicial proceeding from taking an inconsistent position in a later proceeding." *Jones v. Randle*, 278 Or App 39, 41, 373 P3d 1186 (2016) (citing *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609, 892 P2d 683 (1995)). The Supreme Court has set out a three-pronged test for judicial estoppel: benefit in the earlier proceeding to the party to be estopped, different judicial proceedings, and inconsistent positions in the different judicial proceedings. *Id.* at 44. "Judicial estoppel is primarily concerned with the integrity of the judicial process and not with the relationship of the parties." *Day v. Advanced M&D Sales*, 336 Or 511, 524, 86 P3d 678 (2004) (internal quotation marks and emphasis omitted).

Assuming the doctrine could otherwise be invoked here, as Qwest points out, NPCC has not pointed out "any representations Qwest made in 1997 that are *inconsistent* with anything Qwest represented to PUC." (Emphasis in original.) As noted, in seeking the 45-day extended period in which to file new tariffs that was ultimately granted in the Waiver Order, the coalition of local exchange carriers

stated that, to the extent that the new tariffs were lower than existing rates, they would make refunds. Waiver Order at ¶ 14. Accordingly, the Waiver Order included the refund requirement for local exchange carriers who sought to "rely on the waiver" granted therein. *Id.* at ¶ 25. Suffice it to say that Qwest's representations, as part of the coalition of companies seeking the Waiver Order, do not preclude Qwest from arguing in this case that it did not rely on the Waiver Order in Oregon and is, therefore, not liable for refunds thereunder. We, therefore, reject NPCC's argument that the doctrine of judicial estoppel precluded summary judgment in Qwest's favor in this case.[10]

As noted, NPCC also asserts that the PUC erred in denying, in part, its motion to amend and in granting Qwest's motions to strike the first and second amended complaints. It raises a number of arguments in support of those contentions. We reject its contentions as to those rulings, which we review for an abuse of discretion, without discussion, except to make one brief point.

In support of its arguments, NPCC relies on our 2004 decision in *Northwest Public Communications Council*, 196 Or App 94. To the extent that NPCC contends that that decision—which related to the rate case and *not* the claim for a refund in this case—required the PUC to view NPCC's complaint in this case in a particular way, or to allow NPCC to amend its complaint, it is mistaken. That case related to the methodology used by the PUC in setting Qwest's rates. Specifically, we concluded that, in its rate-setting order, the PUC had not properly considered whether the rates complied with the new services test. Accordingly, we remanded the case for the PUC to reconsider its rates "in light of the New Services Order and other relevant FCC orders." *Id.* at 100. Our decision in that case is, essentially, irrelevant to whether the PUC properly ruled, in this case, on NPCC's attempts to add claims to its complaint.

---

[10] In addition, to the extent that NPCC now seeks to assert that issues of fact precluded summary judgment, we note that it did not make that argument before the PUC (and, indeed, argued in its own motion for summary judgment that no disputed issues of material fact existed). Furthermore, NPCC's argument does not point to anything that we are persuaded amounts to a disputed issue *of fact*.

In sum, we reject all of NPCC's assignments of error and, accordingly, affirm the orders of the PUC.

Affirmed.