Argued and submitted March 30, 2021, reversed and remanded
December 14, 2022

# NORTHWEST PUBLIC COMMUNICATIONS COUNCIL,
*Petitioner,*

*v.*

# QWEST CORPORATION,
fka U.S. West Communications, Inc.; and
Public Utility Commission of Oregon,
*Respondents.*

## Public Utility Commission of Oregon
UT125; A166810

527 P3d 30

Northwest Public Communications Council (NPCC) seeks judicial review of a final order of the Oregon Public Utilities Commission (PUC) that denied NPCC's motion to order Qwest Corporation (Qwest) to issue refunds for payphone rates Qwest charged NPCC's members between 1996 and 2003, which NPCC contends do not comply with federal law. NPCC argues that the PUC's prior orders and state and federal law require the PUC to order Qwest to issue the requested refunds, and it challenges two findings of fact as lacking substantial evidence. *Held*: The PUC's prior orders in this docket neither require nor preclude the requested refunds and, on this record, the Court of Appeals cannot determine whether state and federal law require the PUC to order the requested refunds. However, the PUC relied on factual findings that are not supported by substantial evidence.

Reversed and remanded.

James A. Pikl argued the cause for petitioner. On the opening brief were Frank G. Patrick and Corporate Lawyers, P.C. Also on the reply brief were James A. Pikl and Scheef & Stone, LLP.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent Public Utility Commission of Oregon. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Lawrence H. Reichman argued the cause for respondent Qwest Corporation. Also on the brief was Perkins Coie LLP.

Before Ortega, Presiding Judge, and James, Judge, and Powers, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Petitioner Northwest Public Communications Council (NPCC) is a regional trade association representing companies that provide public payphone services (payphone service providers or PSPs). Respondent Oregon Public Utilities Commission (PUC) sets rates that PSPs pay to respondent Qwest Corporation (Qwest), a regulated local exchange carrier (LEC) and former regional Bell Operating Company (BOC),[1] for telecommunications services in Oregon. NPCC seeks judicial review of a PUC final order (PUC Docket UT 125, Order No. 17-473) that denied NPCC's motion to order Qwest to issue refunds for payphone rates Qwest charged PSPs between 1996 and 2003, which NPCC contends do not comply with federal law.

On review, NPCC asserts that the PUC erred in denying the motion because, in NPCC's view, the PUC's prior orders in PUC Docket UT 125 and state and federal law require the PUC to order Qwest to pay the requested refunds. We conclude that the PUC's prior orders in this docket neither require nor preclude the requested refunds and that, on this record, we cannot say whether state and federal law require the PUC to order the requested refunds. However, because we conclude that the PUC relied on factual findings that are not supported by substantial evidence, we reverse Order No. 17-473 and remand to the PUC for reconsideration.

## I. LEGAL BACKGROUND

To place the parties' dispute in context, we begin with an overview of the relevant legal background. "Because public utilities are natural monopolies, the rates that they charge for their services are regulated." *Gearhart v. PUC*, 255 Or App 58, 60, 299 P3d 533 (2013), *aff'd*, 356 Or 216, 339 P3d 904 (2014) (*Gearhart I*). "The legislature has given the PUC the broadest grant of authority—'commensurate with that of the legislature itself'—to carry out ratemaking

---

[1] Bell Operating Companies "are those LECs that were part of the former Bell System, which provided the great majority of local telephone service throughout the country, and their successors." *Northwest Public Communications Council v. PUC*, 196 Or App 94, 98 n 5, 100 P3d 776 (2004); 47 USC § 153(5) (listing BOCs, including Qwest's predecessor, US West Communications Company).

and other regulatory functions." *Id.* at 61 (quoting *Pacific N.W. Bell v. Sabin*, 21 Or App 200, 214, 534 P2d 984, *rev den* (1975)).

The PUC's general powers under Oregon law are set forth in ORS 756.040, which provides, in relevant part:

"(1)    In addition to the powers and duties now or hereafter transferred to or vested in the Public Utility Commission, the commission shall represent the customers of any public utility or telecommunications utility and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates. The commission shall balance the interests of the utility investor and the consumer in establishing fair and reasonable rates. Rates are fair and reasonable for the purposes of this subsection if the rates provide adequate revenue both for operating expenses of the public utility or telecommunications utility and for capital costs of the utility, with a return to the equity holder that is:

"(a)    Commensurate with the return on investments in other enterprises having corresponding risks; and

"(b)    Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital.

"(2)    The commission is vested with power and jurisdiction to supervise and regulate every public utility and telecommunications utility in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction."

The legislature has further directed that those laws administered by the PUC "shall be liberally construed in a manner consistent with the directives of ORS 756.040(1) to promote the public welfare, efficient facilities and substantial justice between customers and public and telecommunications utilities." ORS 756.062(2).

The PUC's "power to prescribe prospective rates is considered a legislative function" and involves "considerable discretion to balance the interests of utility investors and customers and the public in general." *Gearhart I*, 255 Or App at 60-61 (citing ORS 756.040(1) and *Valley & Siletz R. R. Co. v. Flagg*, 195 Or 683, 715, 247 P2d 639 (1952)). Indeed, the PUC's "broad discretion in its legislative function of setting rates[ is] subject only to statutory and constitutional constraints." *Id.* at 61 (citing *American Can v. Lobdell*, 55 Or App 451, 462-63, 638 P2d 1152, *rev den*, 293 Or 190 (1982)).

The PUC sets rates "[i]n conjunction with its consideration of the interests of customers and the public * * * so as to provide a utility with an opportunity to recover its revenue requirement, which is the amount of money the utility must collect to cover its reasonable operating expenses incurred in providing services, as well as a reasonable return on investments made to provide that service." *Gearhart I*, 255 Or App at 62 (citing ORS 756.040(1)). The ratemaking process under Oregon law does not prescribe a precise formula or a "fixed result," but rather "allows the PUC to set just and reasonable rates based on its forecast of the utility's revenue needs and consideration of the interests of customers and the public." *Gearhart I*, 255 Or App at 63; *Pacific N.W. Bell*, 21 Or App at 224 (The PUC "is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable rates.'"). Because "rates are set prospectively, they necessarily involve estimates as to the amount of revenue that will be raised, which may be more or less than estimated" and "the validity of a particular determined rate is measured, not on the individual theories or methodologies used by the PUC, but on the 'end result' and whether it is just and reasonable." *Gearhart I*, 255 Or App at 63.

One consequence of focusing on whether the utility's overall revenue requirement is just and reasonable is that "reducing the rates for one service is likely to require raising the rates for another." *Northwest Public Communications Council v. PUC*, 196 Or App 94, 96, 100 P3d 776 (2004) (*NPCC I*). Ratemaking under Oregon law therefore permits "a practice known as cross-subsidization" where "the rates for one service may be greater than [the utility's] costs while

the rates for another may be less," and "the first service is said to subsidize the second." *Id.* at 96-98.

Such cross-subsidization has been a problem historically in the payphone services market:

> "'Since the mid-1980s, independent payphone providers have competed with Bell Operating Companies in the consumer payphone market. At first, Bell Operating Companies had a built-in advantage. In addition to operating some payphones, Bell Operating Companies owned the local phone lines that provide service to *all* payphones. An independent payphone provider was thus 'both a competitor and a customer' of the local Bell Operating Company. *Davel Communications, Inc. v. Qwest Corp.*, 460 F3d 1075, 1081 (9th Cir 2006). And that Bell Operating Company could exploit its control over the local phone lines by charging lower service rates to its own payphones or higher service rates to independent payphone providers.'"

*Northwest Public Communications Council v. Qwest Corp.*, 279 Or App 626, 629, 379 P3d 633 (2016), *rev den*, 361 Or 886 (2017) (*NPCC II*) (quoting *Illinois Public Telecommunications Ass'n. v. F.C.C.*, 752 F3d 1018, 1020 (DC Cir 2014), *cert den*, 575 US 912, 135 S Ct 1583, 191 L Ed 2d 636 (2015)); *see also NPCC I*, 196 Or App at 98 ("The traditional regulatory approach [under state law] permitted [LECs] to subsidize their payphone services from their earnings on other services.").

To address that historical problem, Congress enacted legislation that placed additional constraints on how state utility commissions set payphone service rates. The Telecommunications Act of 1996 amended 47 USC section 276 (section 276) "to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public." 47 USC § 276(b)(1). Section 276(a) provides that a Bell Operating Company "shall not subsidize its payphone service directly or indirectly" or "prefer or discriminate in favor of its payphone service." Section 276(b) requires the Federal Communications Commission (FCC) to "prescribe regulations" governing rates charged by BOCs, including "a set of nonstructural safeguards" to prevent cross-subsidization that "shall, at a minimum," incorporate the "Computer III

standards," more commonly known as the new services test (NST). 47 USC § 276(b)(1)(C); *NPCC I*, 196 Or App at 98. Under the NST, which the FCC had previously adopted for certain new telecommunications services, "the cost for a service should be the direct cost of providing the services, together with an appropriate level of overhead costs." *NPCC I*, 196 Or App at 101 (Wollheim, J., concurring) (citing *New England Public Communications v. F.C.C.*, 334 F3d 69, 71-72 (DC Cir 2003)).

Over the years, the FCC has "issued a series of orders intended to implement the requirements of the 1996 Act." *NPCC II*, 279 Or App at 630. Those regulations preempt "inconsistent" requirements under state law, 47 USC § 276(c), and are binding in Oregon. *NPCC I*, 196 Or App at 100.

Relevant to this case, in 2013, the FCC issued an order that clarified its prior orders implementing section 276 and provided further guidance on how states should implement section 276. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 28 FCC Rcd 2615 (FCC 2013), *aff'd sub nom Illinois Public Telecommunications Ass'n. v. F.C.C.*, 752 F3d 1018 (DC Cir 2014), *cert den*, 575 US 912, 135 S Ct 1583, 191 L Ed 2d 636 (2015) (Clarification Order). The FCC explained that it had "charged the states with the responsibility to ensure that BOC intrastate payphone line rates comply with the NST and provided the states with general guidance regarding compliance." Clarification Order ¶ 38 (citing *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 11 FCC Rcd 21233, 21308 ¶ 163 (FCC 1996) *order clarified sub nom Albert H. Kramer*, 13 FCC Rcd 3239 (FCC 1997), *rev granted in part, cause rem'd sub nom Illinois Public Telecommunications Ass'n v. F.C.C.*, 117 F3d 555 (DC Cir 1997), *clarified on reh'g*, 123 F3d 693 (DC Cir 1997) (Payphone Reconsideration Order)). That general guidance had stated that payphone rates "must be: (1) cost-based; (2) consistent with the requirements of section 276 with regard, for example, to the removal of subsidies from exchange and exchange access services; and (3) nondiscriminatory," and that "states must apply these requirements and the Computer III guidelines"

to intrastate service rates. Clarification Order ¶ 38 (citing Payphone Reconsideration Order ¶ 163).

The FCC explained that it had allowed BOCs to "self-certify compliance with the NST" and had not specifically addressed "whether refunds should be issued if a subsequent proceeding determined that the rates the BOCs self-certified were not consistent with the NST" but rather had left the issue of refunds, "[l]ike other tariff and rate-setting procedures," to be "properly administered by the states." Clarification Order ¶ 38 (footnote omitted). The FCC further explained that it had also "provided states with more specific guidance on how to implement the NST," such as using "an appropriate forward-looking economic cost methodology" and identifying which payphones services should be NST-compliant. Clarification Order at ¶ 39 (citing *In re Wisconsin Public Service Comm'n*, 17 FCC Rcd 2051, 2065-71 (FCC 2002), *rev den*, *order aff'd sub nom New England Public Commcations Council, Inc. v. F.C.C.*, 334 F3d 69 (DC Cir 2003), *order corrected on denial of recons sub nom In re Wisconsin Public Service Commision Order Directing Filings*, 21 FCC Rcd 7724 (FCC 2006) ¶¶ 45-65 (Wisconsin Payphone Order)).

As to refunds for non-NST-compliant payphone rates, the FCC clarified that, "[a]lthough section 276 establishes requirements for payphone rates, it does not dictate whether refunds are due under any given set of circumstances." Clarification Order ¶ 41. The FCC confirmed that,

> "consistent with section 276 and the Commission's *Payphone Orders*, states may, but are not required to, order refunds for any period after April 15, 1997 that a BOC does not have NST-compliant rates in effect. *** Section 276 requires that any BOC providing payphone service '(1) shall not subsidize its payphone service directly or indirectly from its telephone exchange operations or its exchange access operations, and (2) shall not prefer or discriminate in favor of its payphone service.' To meet these statutory requirements, the Commission's *Payphone Orders* required that BOC payphone rates be NST-compliant. Consistent with the statute and these Commission decisions, states can find that refunds are necessary for any period of time after April 15, 1997 during which BOCs' rates were not NST compliant."

Clarification Order ¶ 47 (footnotes omitted, italics in original).

## II.  FACTS AND PROCEDURAL HISTORY

With that legal background in mind, we turn to the facts of this case. The PUC opened PUC Docket UT 125 in 1995 to review rates for all of Qwest's regulated intrastate telecommunications services, including the two payphone service rates at issue in this case: public access line (PAL) and fraud protection services.[2] Under state law, the PUC's task was "to determine, after a hearing, whether Qwest had proved that its proposed rates were just and reasonable, and, if they were not, to adjust the rates so that they were." *NPCC I*, 196 Or App at 96 (citing ORS 759.180(1)). To make that determination, the PUC "followed the traditional procedure for reviewing a regulated utility's rate schedule." *Id.* In the first phase of the proceeding, the PUC determined the total annual revenue Qwest was entitled to earn (Phase 1 or revenue requirement phase). Specifically, in Phase 1, the PUC "established the rate of return that Qwest was entitled to receive on its property that is used or useful for providing regulated services in Oregon (Qwest's rate base)." *Id.* In the second phase of the proceeding, "the PUC evaluated the rates that Qwest proposed for its various services and made appropriate adjustments so that, as a package, they would provide [Qwest] the opportunity to earn that return" (Phase 2 or rate design phase). *Id.* (emphasis added). In other words, in Phase 2, the PUC set Qwest's telecommunications rates so that, together, they met Qwest's overall revenue requirement determined in Phase 1.

Pending completion of both phases of the rate review, the PUC ordered all of Qwest's service rates to be interim and subject to refund with interest as of May 1, 1996.

A.  *Phase 1: The PUC determines Qwest's revenue requirement.*

The PUC concluded Phase 1 in 2000 when it adopted a stipulation between Qwest and PUC staff. Pursuant to that stipulation, the PUC ordered Qwest to (1) reduce its annual revenues by $63 million; (2) make a one-time, lump sum refund of revenues for the period of May 1, 1996, to the

---

[2] A public access line is how a PSP connects a payphone to Qwest's local telephone network. Qwest's fraud protection service, formerly known as CustomNet, is a call screening service that PSPs need to avoid fraudulent payphone use by customers, such as making long distance calls at a local call rate.

date of the refund of $53 million per year; and (3) provide temporary bill credits of $63 million per year to reduce its revenues going forward until the PUC could conclude the Phase 2 rate design.

The refund and bill credits were based on "the traditional procedure for reviewing a regulated utility's rate schedule." *NPCC I*, 196 Or App at 96. Accordingly, the refunds the PUC ordered Qwest to pay in Phase 1 returned to customers revenues Qwest earned above what its overall revenue should have been while its rates were interim. Similarly, the bill credits functioned to reduce Qwest's overall annual revenue by $63 million going forward until the PUC could adjust Qwest's rates to meet that revenue reduction in Phase 2.

NPCC objected to the stipulation, maintaining that Qwest had not established that its payphone rates complied with section 276 and the NST and, therefore, that Qwest may be required to pay additional refunds to PSPs. In asking the PUC to adopt the stipulation, Qwest and PUC staff argued that the PUC could not determine that any specific customers or customer groups had overpaid for telecommunication services until the Phase 2 rate design was completed. The PUC agreed with Qwest and PUC staff that, on the record before it, it could not decide whether Qwest's payphone rates complied with section 276 and determined that the overall result of the stipulation was "just and reasonable" under state law. ORS 757.210(1)(a).

B.  *Phase 2: The PUC designs Qwest's telecommunications rates.*

The PUC concluded Phase 2 in 2001 when it approved Qwest's proposed telecommunications rates. The PUC reiterated that it was "establish[ing] the rate design for the stipulated revenue requirement" set in Phase 1. NPCC had objected to Qwest's rate proposal, again arguing that Qwest's PAL and fraud protection rates were subject to the NST and therefore must be based on Qwest's actual cost to provide the service plus reasonable overhead. NPCC had also argued that Qwest's proposed PAL and fraud protection rates exceeded rates allowed under section 276. The PUC concluded that Qwest's PAL rates satisfied the NST

and that Qwest's fraud protection rates need not comply with the NST. The PUC later denied NPCC's motion for reconsideration.

C.   *Phase 2: NPCC appeals the initial Phase 2 orders in NPCC I.*

NPCC sought judicial review of the Phase 2 rate design order and the order denying reconsideration. On appeal to this court, NPCC argued that section 276 and the FCC orders implementing section 276 "fundamentally changed the method for setting rates for payphone services that Bell operating companies (BOCs), including Qwest, provide to PSPs" and "requires the PUC to focus on a BOC's cost of providing the specific payphone service at issue rather than on its total rate of return, thereby allowing PSPs to compete with the BOC's own payphones on a more equal footing." *NPCC I*, 196 Or App at 97-98. We agreed with NPCC that the PUC erred because it failed to apply the FCC's approach to payphone service rates and reversed and remanded the order to the PUC for reconsideration "in light of *** relevant FCC orders." *NPCC I*, 196 Or App at 98-100 (footnotes omitted).

D.   *Phase 2: Proceedings on Remand*

While *NPCC I* was pending, Qwest proposed "significantly reduced" PAL rates in Advice Nos. 1935 (effective March 17, 2003) and 1946 (effective August 28, 2003). In 2006, Qwest proposed payphone service rates identical to those already in effect from Advice Nos. 1935 and 1946.

Also in 2006, Qwest proposed to increase its non-payphone rates to make up the difference in annual revenue from the lower, NST-compliant payphone rates that would be necessary to comply with the *NPCC I* remand. The PUC denied Qwest's proposal, concluding that the Phase 1 stipulation precluded increasing non-payphone rates. The PUC reasoned that, while "Qwest specifically agreed to accept the risk that subsequent appeals of the [PUC]'s order implementing the [Phase 1] [s]tipulation might result in a situation where Qwest was required to make refunds or rate reductions in addition to those set forth in the [s]tipulation," it "cannot imagine that the [PUC] or any of

the parties, including Qwest, would have been willing to agree to any scenario requiring the agency to start [Phase 1] all over again if Qwest's refund/rate reduction obligations were increased." The PUC explained that its "obligation on remand [from *NPCC I*] is limited to ensuring that the rates for payphone services are calculated based upon the federal methodology prescribed by the FCC."

In 2007, the PUC adopted a stipulation between PUC staff, Qwest, and NPCC as to "the unresolved issues on remand" from *NPCC I*, namely "whether the PAL and [f]raud [p]rotection rates filed on March 31, 2006, comply with the [c]ourt's remand to develop rates in compliance with applicable federal requirements, and in particular, the new services test." The parties agreed that Qwest's proposed PAL and fraud protection rates filed on March 31, 2006, which were identical to the payphone rates Qwest proposed in 2003, complied with federal requirements and satisfied the remand from *NPCC I*. The PUC reviewed the parties' stipulation together with the testimony and exhibits filed in support of the agreement and concluded that Qwest's proposed PAL and fraud protection rates filed March 31, 2006, complied with applicable federal requirements, including the new services test.

E.  *NPCC's Motion and the Final Order on Review*

In 2017, NPCC filed a motion in PUC Docket UT 125 asking the PUC (1) to issue an order requiring Qwest to show cause why it is not in violation of the PUC's prior orders in this docket and state and federal law, and, (2) alternatively, to amend the 2007 order entered after remand "to expressly require Qwest to issue refunds for any excess revenue it collected under rates that failed to comply with [prior orders in PUC Docket UT 125], the Telecommunications Act of 1996, and state law, less any refunds previously paid."

The PUC denied the motion in Order No. 17-473. The PUC concluded that its prior orders "comprehensively resolved all [of Qwest's] refund liability from May 1996 through 2000" and that its 2007 order issued after the *NPCC I* remand "resolve[d] all outstanding issues" between the parties, including the issue of additional refunds for allegedly non-NST-compliant rates between 1996 and 2003.

After the PUC found that its prior orders precluded Qwest from additional refund liability, the PUC further concluded, "We find no other [PUC] authority or remedy available to NPCC to pursue refunds for this time period. We find no legal error in our rate setting orders in this docket, and we find there is no other authority available to NPCC to seek refunds here." NPCC timely petitioned for judicial review.

### III.  STANDARD OF REVIEW

Our review of the PUC's final order is "confined to the record," and we will "not substitute [our] judgment for that of the [PUC] as to any issue of fact or agency discretion." ORS 183.482(7); ORS 756.610(1) (providing that PUC final orders are subject to judicial review under ORS 183.480 to 183.497). Relevant to NPCC's arguments, we review the PUC's order for legal error and whether the order is "supported by substantial evidence in the record." ORS 183.482(8)(a), (c). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." *Portland Fire Fighters' Ass'n. v. City of Portland*, 321 Or App 569, 577, 518 P3d 611 (2022).

### IV.  ANALYSIS

On review, NPCC advances several arguments challenging Order No. 17-473.[3] As an initial matter, we do not address NPCC's arguments that the PUC erred in denying the motion on procedural grounds, because the PUC concedes that it decided NPCC's motion on the merits and does not present any argument on appeal defending its order on procedural grounds.

Turning to NPCC's substantive arguments, NPCC argues that the PUC erred in denying its motion because the PUC is required to order Qwest to issue refunds for alleged

---

[3]  NPCC raises five assignments of error, each challenging various aspects of the PUC's order, that amount to separate arguments in support of a single assignment of error challenging the PUC's order denying NPCC's motion. ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual or other ruling that is being challenged."); *see, e.g.*, *Marc Nelson Oil Products, Inc. v. Grim Logging Co.*, 199 Or App 73, 75 n 1, 110 P3d 120, *adh'd to as modified on recons*, 200 Or App 239, 115 P3d 935 (2005) ("[A]ssignments of error *** are to be directed against rulings by the trial court, not against components of the trial court's reasoning or analysis that underlie that ruling.").

non-NST-compliant payphone rates between 1996 and 2003 under prior PUC orders in this docket and under state and federal law. NPCC specifically challenges two PUC findings as lacking substantial evidence: (1) that the PUC had previously determined Qwest's 1997 PAL rates (Advice No. 1668) to be NST-compliant; and (2) that its 2007 order (Order No. 07-497) had resolved all of Qwest's refund liability from 1996-2003.

In response, the PUC and Qwest argue that the PUC correctly concluded that its prior orders in this docket and state law do not require it to order Qwest to pay the requested refunds. The PUC acknowledges that NPCC's motion also relied on federal law, and specifically section 276, but asserts that "NPCC does not advance that argument in this appeal" and that, in any event, this court has "already rejected the theory that federal law requires Qwest to pay additional refunds" in *NPCC II*. Qwest argues that NPCC's motion and appeal rely solely on the Phase 1 orders.

We conclude that the PUC's prior orders in PUC Docket UT 125 do not require, but also do not preclude, the requested refunds, and we agree that the two challenged findings are not supported by substantial evidence. We further conclude that, on this record, we cannot determine whether state and federal law require the PUC to order the requested refunds, because the PUC has not yet determined whether Qwest's pre-2003 payphone rates complied with federal law.

We begin with the question whether the PUC correctly concluded that its prior orders in this docket do not require Qwest to pay refunds for allegedly non-NST-compliant payphone rates between 1996 and 2003. At the outset, we reject the argument, advanced by both the PUC and Qwest, that the PUC's interpretation of its prior orders is entitled to deference akin to an agency's interpretation of its own rules. *See Calpine Energy Solutions LLC v. PUC*, 298 Or App 143, 162-63, 445 P3d 308 (2019) (reviewing the PUC's statement that it had addressed an issue in a prior order for substantial evidence under ORS 183.482(8)(c) and not consistency with an agency rule, officially-stated position, or practice under ORS 183.482(8)(b)(B)).

As noted, in this docket, the PUC reviewed all of Qwest's telecommunications rates pursuant to the traditional regulatory method under Oregon law that focused on whether Qwest's rates as a whole met its overall revenue requirement. As Qwest acknowledges in its brief, the refunds and bill credits that the PUC ordered Qwest to pay in Phase 1 (Order Nos. 00-190 and 00-191) served to implement that adjusted annual revenue reduction both retroactively (via refunds) and prospectively (via bill credits) until the PUC concluded the Phase 2 rate design. The Phase 1 refunds and bill credits did not redress any alleged violation of federal law. Indeed, the PUC acknowledged NPCC's position at the time that Qwest may be liable for additional refunds under section 276 but concluded that the record before it did not allow it to resolve that question. Thus, the language in the Phase 1 orders that the refund was a "one-time, lump sum" does not support Qwest's position that the PUC agreed that Qwest had no liability for potential violations of section 276. Rather, that language simply contemplated a one-time, lump sum refund for excess revenues Qwest had earned while its rates were interim that was based solely on the reduced revenue requirement under state law. And even that language was not absolute in the context of the state law rate review because the PUC later expressly interpreted the Phase 1 stipulation to contemplate Qwest paying additional refunds in the event that the Phase 1 stipulation or an order implementing the stipulation (*i.e.*, a Phase 2 order) were reversed on appeal, as occurred in *NPCC I*. Accordingly, the Phase 1 orders (Order Nos. 00-190 and 00-191) do not require or preclude Qwest's refund liability for non-NST-compliant rates between 1996 and 2003.

In the initial Phase 2 rate design order (Order No. 01-810), the PUC concluded that Qwest's fraud protection rates need not comply with the NST and found that Qwest's 1997 PAL rates (Advice No. 1668) complied with the NST. NPCC appealed that order and the order denying reconsideration, and, in *NPCC I*, we reversed and remanded both initial Phase 2 orders. 196 Or App at 100 ("The PUC must reconsider its order [approving payphone rates] in light of *** relevant FCC orders."). Reconsidering its determinations regarding Qwest's payphone rates was squarely within

the scope of remand. *Village at Main Street Phase II, LLC v. Dept. of Rev.*, 360 Or 738, 749, 387 P3d 374 (2016) ("The scope of remand is established by the appellate court's opinion in a particular case."); *see also NPCC I*, 196 Or App at 106-08 (Wollheim, J., concurring) (discussing, in detail, how the PUC erred in determining that Qwest's PAL rates satisfied the NST and fraud protection rates were not subject to the NST). Accordingly, we agree with NPCC that the PUC's finding in the order on review (Order No. 17-473) that it had previously determined Qwest's 1997 PAL rates (Advice No. 1668) to be NST-compliant is not supported by substantial evidence.[4]

We turn to whether the Phase 2 rate design order (Order No. 07-497) entered after the *NPCC I* remand precludes the requested refunds, which is a closer question. The order describes its scope as "resolv[ing] all outstanding issues and satisfy[ing]" the remand from *NPCC I* and frames those "unresolved issues" as "whether [Qwest's] PAL and [f]raud [p]rotection rates filed on March 31, 2006, comply with the [Court of Appeals] remand *to develop rates* in compliance with applicable federal requirements, and in particular, the new services test" prescribed by the FCC. (Emphasis added.) Thus, the Phase 2 rate design order entered on remand did not determine whether Qwest's pre-2003/2006 payphone rates complied with the NST, nor whether to order refunds for that time period. That makes sense, given that the PUC generally sets rates prospectively.

Thus, our review of the orders in this docket leads us to conclude that, although none of the PUC's prior orders require Qwest to pay additional refunds, none of the orders

---

[4] We also disagree with the PUC's assertion that our decision in *NPCC II* "conclusively answered the question of whether or not Qwest's 1997 [PAL] rates satisfied the new services test." *NPCC II* involved NPCC's complaint asking the PUC to order Qwest to issue refunds for non-NST-compliant rates solely under one specific FCC order, *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 12 FCC Rcd 21370 (FCC 1997) (Waiver Order). 279 Or App at 634. We affirmed the PUC's order denying NPCC's motion to amend its complaint without extended discussion. *Id.* at 646. We also affirmed the PUC's grant of summary judgment in favor of Qwest, because it was undisputed that Qwest did not rely on the waiver granted under the Waiver Order that triggered the refund obligation under that specific order. *Id.* at 642-45. *NPCC II* did not address whether Qwest's 1997 PAL rates satisfied the new services test.

in this docket, including the 2007 order on remand, preclude Qwest from additional refund liability for non-NST-compliant rates from 1996-2003. As far as we can tell, the PUC has never (properly) determined whether Qwest's 1996-2003 payphone rates were NST-compliant. The record as a whole does not permit a reasonable person to conclude that the PUC "comprehensively resolved" Qwest's refund liability for potential violations of federal law from that time period, particularly given that the PUC made clear throughout both Phase 1 and Phase 2 that it was pursuing the traditional regulatory method under Oregon law and repeatedly declined NPCC's invitation to decide whether Qwest's payphone rates violated federal law or whether Qwest may be liable for additional refunds for alleged violations of federal law.[5]

We next turn to NPCC's contention that state and federal law require the PUC to order the requested refunds. As noted, the FCC has made clear that, "consistent with section 276 and the Commission's *Payphone Orders*, states may, but are not required to, order refunds for any period after April 15, 1997 that a BOC does not have NST-compliant rates in effect." Clarification Order at ¶ 47 (italics in original). But, as our review of the PUC's prior orders in this docket makes clear, the PUC has not yet determined whether Qwest's pre-2003 payphone rates are NST-compliant. Thus, on this record, we cannot say one way or another whether state and federal law require the PUC to issue the requested refunds.

However, we can say that the PUC incorrectly concluded that, outside of its prior orders, no "authority or remedy [is] available to NPCC to pursue refunds for this time period." The PUC's broad regulatory authority consists of "powers *and* duties." ORS 756.040(1) (emphasis added). In addition to its "power and jurisdiction to supervise and regulate every public utility and telecommunications utility in this state, and to do all things necessary and convenient" in exercising that power, the PUC "*shall* represent" ratepayers

---

[5] For the same reason, we also reject the contention, advanced by both the PUC and Qwest, that NPCC "waived" any challenge to Qwest's potential refund liability for its pre-2003 payphone rates by failing to appeal the 2007 remand order. The PUC did not address that issue in Order No. 07-497, so it is unclear how NPCC could have challenged that issue on appeal.

"in all controversies respecting rates," *id.*, "*shall* make use of [its] jurisdiction and powers" to "protect" ratepayers "from unjust and unreasonable exactions and practices," *id.*, "*shall* inquire into any \* \* \* violation of any law of this state \* \* \* relating to public utilities and telecommunications utilities by any public utility or telecommunications utility doing business therein," and "*shall* enforce all laws of this state relating to" such utilities, ORS 756.160(1) (emphases added). And "a liberal construction of both the PUC's power to 'supervise and regulate public utilities' and its duty to protect ratepayers by obtaining adequate service at fair and reasonable rates supports the PUC's implied authority to correct legal errors that lead to 'unjust and unreasonable exactions.'" *Gearhart v. PUC*, 356 Or 216, 244, 339 P3d 904 (2014) (*Gearhart II*) (quoting ORS 756.040(1) and ORS 756.062(2)). The PUC has authority to correct such errors by ordering refunds, "and if the PUC could not order refunds, it would be limited in its ability to protect ratepayers." *Id.*

Under the applicable regulatory scheme, the PUC does not have discretion to simply ignore NPCC's allegations that Qwest's pre-2003 payphone rates violate section 276. And if, after proper inquiry, the PUC finds that Qwest's pre-2003 payphone rates exceeded that allowed by federal law and amount to "unjust and unreasonable exactions," the PUC has a duty to protect ratepayers, including NPCC's members, by providing some appropriate remedy. Such a remedy may include ordering refunds for overcharges, *see Gearhart II*, 356 Or at 247 (holding that the PUC had implied authority to order PGE to issue refunds to ratepayers for amounts associated with a retired nuclear generating facility), and one way it may do so is by amending its prior order, as NPCC sought in its motion, *see* ORS 756.568 (The PUC "may at any time" amend any PUC order upon notice to the telecommunications utility and an opportunity to be heard.).

Reversed and remanded.